IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LISA M. ARCHIBALD,

              Plaintiff,

vs.

ANDREW M. SAUL, Commissioner of
the Social Security Administration,

              Defendant.

8:19-CV-313

MEMORANDUM AND ORDER

The plaintiff, Lisa M. Archibald, filed her complaint (filing 1) seeking judicial review of the Commissioner's denial of her application for disability insurance benefits (filing 9-2 at 2-5) under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*., and moved this Court for an order reversing the Commissioner's final decision (filing 12). The Commissioner filed an answer to the complaint (filing 8), and a motion to affirm the agency's final decision denying benefits (filing 15). The Court finds that the Commissioner's decision is not supported by substantial evidence on the record, that the plaintiff's motion to reverse should be granted, and that the Commissioner's motion to affirm should be denied.

## I. FACTUAL BACKGROUND

### 1. MEDICAL AND WORK HISTORY

The plaintiff is a long-time resident of Omaha, Nebraska. Beginning in 2012, the plaintiff reentered the labor market, first working as a telemarketing sales agent, and later as a customer service representative for two different employers. *See* filing 9-2 at 38-43; filing 9-5 at 5-10; filing 9-6 at 5-6. Each job required the plaintiff to interact with customers over the telephone—a skill

that the plaintiff was very familiar with, having been "on the phone" since she was eighteen years old. Filing 9-2 at 45.[1] The plaintiff alleged that her current period of disability began on March 21, 2016, when she was discharged from her employment with Conagra Enterprise Services, Inc. *See* filing 9-2 at 39; filing 9-3 at 2.

The plaintiff's job with Conagra was performed from her home. Filing 9-2 at 39. Conagra provided and installed the equipment for the job in the plaintiff's home office. Filing 9-2 at 59, 74. She attended six weeks of training where she was instructed on all aspects of the job, including how to deal with angry customers. Filing 9-2 at 41, 74. The plaintiff's job performance was monitored remotely by her supervisor. Filing 9-2 at 44. The plaintiff said that every time she logged in, someone else was on her screen, and this person watched every button she pushed. Filing 9-2 at 74.

The plaintiff's Conagra job ended after she had several bad interactions with customers. Filing 9-2 at 39. On the last day of the plaintiff's employment, she had back-to-back bad calls. One caller was being very hostile, yelling and using profanity. The plaintiff told the caller that if they didn't "knock it off, basically" she would disconnect the call. *Id.* When the caller continued with the abuse, she said, "thank you for calling Conagra" and hung up. Filing 9-2 at 40. The plaintiff said she was overwhelmed by the confrontation, but also believed that she followed the proper protocol for dealing with an abusive caller. *Id.* However, the plaintiff admitted that if anybody else had done what she did, they too would have gotten into trouble. Filing 9-2 at 41.

The plaintiff described her mood as emotional, overwhelmed, anxious, and nervous when there was too much yelling on a call. Filing 9-2 at 42. She

---

[1] At the time of the hearing, the plaintiff was fifty-five years old.

said that calls with customers who were reasonable went okay, as long as it was not a critical situation. She described being emotional when she took a call from a woman who reported that something got stuck in her child's throat and had to go to the emergency room. *Id*. The plaintiff said that the personal nature of many calls would often affect her. When the plaintiff felt overwhelmed by a call or caller, she would put her phone on "make busy" and try to regroup and focus. Filing 9-2 at 44. The plaintiff's supervisor would sometimes text or call her and suggest she take the rest of the afternoon off because it sounded like she was having a bad day. *Id*.

Immediately prior to her job with Conagra, the plaintiff worked for Alpine Access, taking calls from consumers who had problems with their eBay or Home Depot accounts. Filing 9-2 at 43. These callers would be in bad moods "from the get-go." *Id*. The plaintiff found herself calling in at least once a week to say she could not work. *Id*. She lost this job because of too many absences. Filing 9-2 at 46.

The plaintiff described a previous period of disability due to anxiety. Filing 9-2 at 75. She said that years ago, she worked in customer services for Physicians Mutual, but had to resign due to anxiety and panic attacks. Filing 9-8 at 10-11. The plaintiff's income records indicate that she was without reported income between 2006 and 2011. The plaintiff said that while on disability, she started feeling better and thought she could get back into the workforce. Filing 9-2 at 75. But when she got back in, "it all came rushing back on me, the anxiety, the anxiousness, and just dealing with the people." *Id*.

After her employment with Conagra was terminated, the plaintiff attempted to find another job. Filing 9-2 at 44. She went to an interview for a customer service position with her old employer, Physicians Mutual, but it did not go well. Filing 9-8 at 10-11. The plaintiff indicated that several people were

being interviewed at the same time, and because she was the oldest, and had the most telephone customer service experience, the director wanted her to "show the young ones how it's done." Filing 9-2 at 44-45. The plaintiff said she did a practice call with the director, where the purpose of the call was merely to upgrade a policy. Filing 9-2 at 45; filing 9-8 at 11. The plaintiff read from a script and everything went well. *Id.* But when they tried to do an off-script call with a man yelling, she became emotional, started crying, and could not keep herself together. *Id.* The plaintiff said she had to dismiss herself from the interview, and when she returned home, she got a call telling her that she would not be hired now, but maybe in the future. *Id.*

The record of the plaintiff's medical care begins with a June 3, 2015, progress note by the plaintiff's primary care physician, Lisa Schalley, M.D. Filing 9-7 at 2. The note indicates that the plaintiff presented in the office for medication refills and with a complaint of left ear pain. *Id.* Among the conditions Dr. Schalley evaluated were the plaintiff's hypertension, asthma, anemia, and anxiety. *Id.* Prescriptions were reauthorized to treat the plaintiff hypertension and anxiety. Filing 9-7 at 3. Dr. Schalley also ordered a complete blood count to monitor the plaintiff's anemia—a condition that resulted from thalassemia due to sickle cell trait. *Id.* The laboratory report indicated that the plaintiff's levels regarding hemoglobin, hematocrit, mean corpuscular volume, mean corpuscular hemoglobin, and mean corpuscular hemoglobin concentration were all below the normal reference range. Filing 9-7 at 12.

The plaintiff returned to Dr. Schalley on March 25, 2016, for prescription refills. Filing 9-7 at 4. Dr. Schalley reported that the plaintiff was "more stressed than usual this week because she lost her job on Monday." *Id.* Dr. Schalley's assessment noted two conditions—mood disorder and anxiety. Filing 9-7 at 6. Also, the plaintiff reported bilateral knee pain, which Dr.

Schalley indicated was not a new condition. The plaintiff had a history of osteoarthritis, and had previously been told that she would someday need knee replacement surgery. *Id.* The plaintiff's laboratory results on this occasion indicated that her hemoglobin level, and other signs indicating anemia, had not changed. Filing 9-7 at 17. Filing 9-7 at 17.

The plaintiff returned to Dr. Schalley on April 22, 2016, for a follow-up regarding her hypertension, insomnia and anxiety. Filing 9-7 at 7. Dr. Schalley noted that the plaintiff had been having trouble sleeping for the past six weeks due to anxiety. *Id.* The plaintiff reported feeling overwhelmed and having racing thoughts when she lies down to sleep. *Id.* Dr. Schalley increased the dosages of the plaintiff's current mood disorder and anti-anxiety prescription medications.

On June 14, the plaintiff presented for individual therapy with Gabrielle Beadell, a Licensed Mental Health Practitioner, to address her issues of anxiety, racing thoughts, and insomnia. Filing 9-8 at 2. Beadell documented the plaintiff's report that her anxiety symptoms began when she was thirty-one years old, and progressed to the point where she had to go on disability. The plaintiff said that she constantly worried about her daughter who lived in an apartment attached to the plaintiff's home, and how the plaintiff had to wait every day until her daughter got home to feel safe. *Id.* Beadell observed the plaintiff's mood as depressed and anxious, and concluded that the most appropriate diagnosis for the plaintiff's condition was generalized anxiety disorder. Filing 9-8 at 6-7.

Pursuant to her treatment plan, the plaintiff, together with her husband, returned to Beadell on June 21, 2016, for her next counseling session. Filing 9-8 at 9. The plaintiff reported feeling stressed and anxious about not being able to contribute financially to her family. *Id.* Beadell wrote that the plaintiff

5

showed distorted thoughts such as jumping to conclusions, all or nothing thinking, and personalization. *Id*. Beadell observed that the plaintiff appeared nervous throughout the session as evidenced by her shallow breathing, wiggling her leg, and by the plaintiff's self-reports. *Id*.

The plaintiff saw Beadell again on July 12. Filing 9-8 at 10. Beadell noted that the plaintiff reported experiencing anxiety when she traveled to Lincoln for a church conference, and how her husband wouldn't turn around when she said she wanted to go back home. *Id*. The plaintiff also told Beadell about her failed interview for the customer services job with Physicians Mutual, and how she started crying and "couldn't keep it together" during the confrontational role-playing incident. Filing 9-8 at 10-11. Beadell observed that the plaintiff had an anxious mood when talking about the loss of a friend, and when talking about her failed job interview, but calmed down as the session continued. Filing 9-8 at 11.

On August 4, 2016, Virginia Smith, APRN, who worked in collaboration with psychiatrist Dr. Imad Alsakaf, conducted a psychiatric diagnostic evaluation of the plaintiff. Smith identified depressive symptoms of insomnia, loss of pleasure/interest, fatigue, and worthlessness/guilt. Filing 9-8 at 13. Smith also reported excessive anxiety symptoms, worry and difficulty controlling worry, restlessness, obsessive thoughts/urges that are intrusive, compulsive behaviors, and panic symptoms of palpitations, sweating, shaking, and chill/hot. *Id*. The plaintiff's mood was observed as anxious, and insight evaluated as fair. Filing 9-8 at 18. Smith diagnosed the plaintiff as suffering from major depressive disorder, recurrent episode, moderate, and made some changes to the plaintiff's prescription medication regime. Filing 9-8 at 19-20.

The plaintiff's next session with Beadell was August 17, which her husband also attended. Beadell reported that the plaintiff appeared to be very

anxious, with her leg shaking throughout the entire session and was at times tearful. Beadell also observed that the tone of the plaintiff's voice and her posture indicated anxiety, as well as the plaintiff's self-reports. Filing 9-8 at 22. Beadell reported that the plaintiff had not taken one of the medications that Smith prescribed because she read the side effects listed on the label and was terrified she would experience suicidal ideations. *Id.* Beadell tried to provide the plaintiff with insight into her fear regarding medication side effects, as well as provide the plaintiff with certain strategies to help her regulate and feel grounded. *Id.*

The plaintiff returned to see Smith on August 24, 2016, for an adjustment of her medications. Filing 9-8 at 24. Smith noted discussing the FDA black box warnings with the plaintiff regarding suicidal thinking, and discussed a safety plan should the plaintiff have such thoughts. The plaintiff returned to see Smith on September 14, for medication management. Filing 9-9 at 2. Smith did not report any change in the plaintiff's condition or changes to her medication regime.

The plaintiff's next mental health treatment visit was with Beadell on October 14, 2016. Filing 9-10 at 2. Beadell reported some improvement in the plaintiff's condition. Specifically, the plaintiff said she was able to call a family member and have a long conversation with them, which was something she had not been able to do for a long time. *Id.* Beadell observed that the plaintiff appeared to be in a good mood, and "didn't get teared up like she normally does in session." *Id.* But, the plaintiff also reported having a panic attack while driving and had to pull over to calm down. *Id.*

When the plaintiff returned to Smith for a medication management check on November 16, Smith reported that the plaintiff's symptoms since her last visit had moderately worsened. Filing 9-10 at 4. The plaintiff felt that the

increase in her Zoloft dosage had increased her depression, and made her feel lethargic and down. *Id*. Smith cut the plaintiff's Zoloft dosage in half, and discontinued the plaintiff's trazodone prescription. Filing 9-10 at 12. The plaintiff saw Beadell on November 18, 2016. Filing 9-10 at 13. Beadell observed that the plaintiff appeared to be anxious and stressed, but calmed down as the session progressed. Filing 9-10 at 14. The plaintiff also told Beadell that she would be losing her insurance in January. *Id*.

The plaintiff's next therapy session with Beadell was December 2, and on this occasion, she was accompanied by her daughter. Filing 9-10 at 15. Beadell reported the plaintiff's diagnosis as moderate episode, recurrent major depressive disorder and generalized anxiety disorder. *Id*. On December 20, the plaintiff returned to see Dr. Schalley for a follow-up on her hypertension. Filing 9-9 at 25. Dr. Schalley noted the plaintiff's continuing insomnia issues and prescribed a medication to replace trazodone. Filing 9-9 at 27. Blood drawn on February 16, 2017, indicated that the plaintiff's anemia symptoms were unchanged. Filing 9-9 at 31.

It was several months before the plaintiff's next reported therapy session. The plaintiff said that Beadell had moved out of town and a therapist wasn't immediately available. Filing 9-2 at 72. The plaintiff said that until she was able to see her new therapist, she would regularly visit with Virginia Smith on the phone as Smith drove home. *Id*. Smith felt that the plaintiff needed counseling, and because the plaintiff had lost her insurance, Smith was talking with her "under the books." *Id*. The plaintiff's first therapy session with her new therapist, Jessica Knight, Ph.D., was October 5, 2017. Dr. Knight's progress note reported meeting with the plaintiff, that the plaintiff reported that her mood and anxiety were worse, and that the plaintiff hoped to take better care of herself to improve her symptoms. Filing 9-10 at 17.

On November 16, 2017, the plaintiff and her husband saw Smith for medication management. Filing 9-10 at 18. The plaintiff reported that her symptoms had significantly worsened since her last visit. *Id*. Smith noted that the plaintiff's symptoms had a significant impact on everyday functioning. The plaintiff reported disturbances with sleep, high anxiety, high irritability, excessive feelings of guilt, and the loss of pleasure in things she used to enjoy. *Id*. The plaintiff told Smith she currently cannot afford to continue with therapy. Smith provided information on the availability of family services and discount prescription services. Smith observed the plaintiff's mood to be depressed and anxious, her affect constricted, thought processes were circumstantial, and insight and judgment were only fair. Smith also observed the plaintiff's gait and station to be unsteady. Filing 9-10 at 22-23.

The plaintiff and her husband returned for a therapy session with Dr. Knight on December 7, 2017. Filing 9-10 at 28. Dr. Knight identified the plaintiff's presenting problem as ongoing intense panic attacks limiting activities and interactions. *Id*. The plaintiff reported having frequent panic attacks, the most recent being two days ago. *Id*. On March 14, 2018, the plaintiff saw Dr. Schalley for routine blood work and a medication check. Filing 9-10 at 49. Among the problems that Dr. Schalley evaluated were the plaintiff's anemia, recurrent episode major depressive disorder, and anxiety. Filing 9-10 at 50-51.

The plaintiff saw Dr. Knight on March 22, 2018, and was accompanied by her husband. Filing 9-10 at 32. Dr. Knight's progress note was unchanged from the plaintiff's last therapy session. The plaintiff reported having frequent panic attacks, feeling overwhelmed by everything, and burdened with excessive guilt. *Id*. Finally, the plaintiff's medical treatment records end with a medication check by Smith on May 16, 2018. Filing 9-10 at 33. Smith noted

that the plaintiff reported that her symptoms were moderately improved and attributed the improvement to the changes made with her medications. *Id*. Smith reported that the plaintiff's insomnia was improved, but the plaintiff still struggled with anxiety, racing thoughts, and worries.

Dr. Schalley provided the state agency with a letter identifying the plaintiff's diagnosed conditions, and opined on the extent to which some of her conditions would affect her functioning. Filing 9-10 at 46. Among the conditions Dr. Schalley identified were moderate anemia due to thalassemia, osteoarthritis of the plaintiff's knees, depression, and anxiety. *Id*. Dr. Schalley opined that the plaintiff's medical problems and arthritis would limit her to standing/walking to less than thirty-minutes at a time and less than two-hours in an eight-hour workday. Dr. Schalley thought that the plaintiff's anemia would cause fatigue and require the plaintiff to take frequent breaks, including the need for at least one hour per day to rest. Further, the plaintiff's anemia and osteoarthritis may cause the plaintiff to miss two or more days of work per month. *Id*.

The state disability examiner referred the plaintiff for two evaluations by medical consultants. William Poulson, M.D., examined the plaintiff on July 25, 2016. Filing 9-7 at 45. Dr. Poulson noted that the plaintiff was obese, was 67 inches tall, and used a cane for walking. Filing 9-7 at 47. Dr. Poulson opined that the plaintiff's obesity had a large impact on her joint stability and was sure that due to her age and weight, the plaintiff had some degree of arthritis. Filing 9-7 at 49. He observed some limited range of motion in the plaintiff's knees, which he also attributed to the plaintiff's weight. *Id*. Dr. Poulson noted that the plaintiff moved throughout the clinic pretty well, but used a cane when necessary. *Id*.

Also on July 25, the plaintiff was interviewed and evaluated by psychologist Jennifer L. Lindner, Ph.D. Filing 9-7 at 39. Dr. Lindner reported that the plaintiff said she has friends but doesn't see them often. She was not comfortable going out in public, and that her husband and daughter do her shopping for her. *Id.* The plaintiff told Dr. Lindner she was diagnosed with panic disorder, but believed she had improved with medications. Filing 9-7 at 40. The plaintiff said she worries about having future panic attacks, thinks too much, and worries about her family, her daughter, and finances. She often has a panic attack when she is asked to do something. She is easily overwhelmed, emotional, cries a lot, and feels helpless. Dr. Lindner observed the plaintiff's mood to be depressed, and that her affect was tearful. Filing 9-7 at 41. The plaintiff reported that her husband primarily did all the cleaning chores, and her daughter makes meals for her. She occasionally visited her parents, and went to church only once a month.

Dr. Lindner thought the plaintiff's prognosis was guarded. She thought it appeared that the plaintiff had significant symptoms of panic disorder and depression that negatively impacted her functioning. Filing 9-7 at 42. Dr. Lindner found that the plaintiff had some impairment in social interactions, and tended to withdraw and avoid interactions with people. Filing 9-7 at 41. Dr. Lindner opined that the plaintiff gets overwhelmed, tends to have panic attacks, and would struggle interacting with coworkers and supervisors. *Id.*

Dr. Lindner was asked to respond to yes/no questions on a form, and to provide examples supporting her responses. When asked if there were difficulties in maintaining social functioning, Dr. Lindner answered yes, and identified that the plaintiff withdraws and avoids interactions. Filing 9-7 at 43. Dr. Lindner was asked whether the plaintiff had recurrent episodes of deterioration when stressed. She responded yes, and explained that when

stressed, the plaintiff had panic attacks and was overly emotional. *Id*. When asked whether the plaintiff had the ability to relate appropriately to co-workers and supervisors, Dr. Lindner responded no, and identified that the plaintiff gets overwhelmed and anxious. *Id*. Finally, Dr. Lindner responded yes, but without providing examples, to whether the plaintiff was able to sustain concentration and attention to complete tasks, understand and remember short and simple instructions, carry out short and simple instructions under ordinary supervision, and adapt to changes in the environment. *Id*.

## 2. ADMINISTRATIVE HEARING

A hearing before an Administrative Law Judge (ALJ) was held on June 27, 2018, in which the plaintiff and a vocational expert were the only witnesses. The vocational expert was not present at the hearing, but testified without objection by telephone conference. Filing 9-2 at 61. The hearing opened with the plaintiff's counsel identifying what he considered to be the main issue: whether the plaintiff was limited to unskilled work and satisfied the Grid rule.[2] Filing 9-2 at 37-38. The plaintiff's counsel asserted that Dr. Lindner's opinion that the plaintiff was unable to relate appropriately to co-workers and supervisors placed the plaintiff in the category of unskilled work. Filing 9-2 at 38.

The ALJ began by asking the plaintiff about her past employment, and specifically about her job with Conagra and the reason for her termination.

---

[2] The "Grid Rules" are a matrix of medical-vocational guidelines for determining whether a claimant is disabled based on given combinations of physical ability, age, education, and work experience. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 2; *see also Heckler v. Campbell*, 461 U.S. 458, 461-62 (1983).

Filing 9-2 at 39-44. The plaintiff explained how confrontational calls overwhelmed her, about hanging up on several abusive callers, and how she believed she was following protocol but admitted that if anyone else had hung up on such callers, they too would have gotten into trouble. *Id*. The plaintiff told the ALJ about her emotional breakdown at her job interview. Filing 9-2 at 44-45. The plaintiff testified that she felt that the problems that have prevented her from working are overwhelming anxiety, nervousness, a loss of energy to get up and do anything, and being very emotional. Filing 9-2 at 46.

Regarding her physical capacity, the plaintiff said she needed both knees replaced and was in constant pain. Filing 9-2 at 47. The source of her knee pain was a traffic accident that occurred when she was in her early thirties. Filing 9-2 at 49-50. The plaintiff "banged up" her right knee, went to physical therapy for a year and a half, and in the course of therapy developed left knee pain. *Id*. Her doctor did not want to do surgery because of her young age, but said by the time she was fifty she would need knee replacement surgery. Filing 9-2 at 48. The plaintiff uses a cane, and said that she uses it both when she goes out and while at home. *Id*. The ALJ asked if the plaintiff's cane was prescribed, and the plaintiff said it was prescribed by the doctor who said she would need knee replacement surgery. *Id*.

The plaintiff said she is unable to cook and do laundry for her family because she is unable to stand for very long. Filing 9-2 at 47-48. She agreed with Dr. Schalley that her anemia contributes to her fatigue and ability to stand for very long. Filing 9-2 at 50. The plaintiff said she does not do any cleaning, yardwork, or shopping. Filing 9-2 at 57-58. She used to be very active in her church, but now rarely goes to services because of her nervousness. Filing 9-2 at 58. Instead, she now calls in to listen to services. *Id*.

The plaintiff was asked if the medications she is taking helps. Filing 9-2 at 54. She said it helps to an extent, but a side effect of the medications is sleepiness. *Id.* The plaintiff described having panic attacks about driving, having trouble forming ideas or thoughts, that she is a loner, and that she doesn't feel like extending herself around people. She said being around people made her very nervous. She gets emotional, tries to run away from conflicts as fast as possible, and doesn't want to argue because it is too overwhelming. Filing 9-2 at 56. The plaintiff said she rests, reclines, or naps several times a day because of her medicines, anemia, and just because she doesn't feel like interacting with anyone. Filing 9-2 at 59-60.

The ALJ asked the vocational expert to classify the plaintiff's past work. The vocational expert considered three titles that were categorized as semi-skilled, and performed either at the light or sedentary exertional level. Filing 9-2 at 62-63. The ALJ then posed the following hypothetical: Assume a worker with the plaintiff's same age, education, and past relevant work history. Assume further such individual would be limited to sedentary work, no ladders, ropes or scaffolds; occasional ramps and stairs; occasionally balance, stoop, kneel, crouch; never crawl; no more than occasional exposure to pulmonary irritants, extreme hot and cold temperatures, or high humidity; and no exposure to hazards such as unprotected heights, or moving mechanical parts. Assume no more than occasional contact with coworkers, and no more than occasional face-to-face contact with the public. Assume such person would be unable to perform complex tasks, but could perform detailed tasks. Filing 9-2 at 64-64.

The ALJ asked whether the plaintiff's past relevant work would remain. The vocational expert replied that the plaintiff's past relevant work as actually performed would remain because she assumed that face-to-face contact meant

that telephone contact would be acceptable. Filing 9-2 at 65. The ALJ confirmed the vocational expert's assumption. *Id*. The ALJ next asked the vocational expert to consider a further restriction of no more than occasional contact with the public as part of the hypothetical person's job duties, replacing the occasional face-to-face contact restriction. *Id*. The vocational expert agreed with the ALJ's assumption that the plaintiff's past relevant work would be excluded with that change in the hypothetical. *Id*. The ALJ then asked the vocational expert to consider the first hypothetical, where phone contact was not precluded, but the person was limited to simple and routine tasks. Would that preclude semi-skilled work? The vocational expert said yes. Filing 9-2 at 66-67. Further, the vocational expert testified that the skills associated with the job titles describing the plaintiff's past work would not be transferable. Filing 9-2 at 65-66.

Finally, the ALJ asked how many absences per month a typical employer would tolerate. The vocational expert replied that if a worker was missing sixteen hours or more per month, that would be beyond what an employer would tolerate. Filing 9-2 at 67. The ALJ asked how much time off-task a typical employer would tolerate. The vocational expert replied, if someone were off-task fifteen to twenty percent of the time or more, they would not be competitively employable. *Id*. The ALJ then asked about unscheduled breaks beyond those typically afforded to employees. The vocational expert said, if an employer is providing extra rest breaks in excess of what other employees get, that would be an accommodation and would not be part of competitive employment. *Id*.

### 3. ALJ'S FINDINGS AND CONCLUSIONS

On October 2, 2018, the ALJ issued an unfavorable decision, finding that the plaintiff was not disabled. Filing 9-2 at 13-26. To determine whether a claimant qualifies for disability benefits, an ALJ performs a five-step sequential analysis of the claim. 20 C.F.R. § 404.1520(a)(4). Regarding step one, the ALJ found that the plaintiff met the insured status requirement of the Social Security Act and that the plaintiff had not engaged in substantial gainful activity since the plaintiff's alleged onset date, March 21, 2016. Filing 10-2 at 18.

At step two, the medical severity of the claimant's impairment is considered. 20 C.F.R. § 404.1520(a)(4)(ii). The claimant has the burden to prove a medically determinable physical or mental impairment, or combination of impairments, that significantly limits the physical or mental ability to perform basic work activity. *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006). The ALJ found the following severe impairments: depression, anxiety disorder, osteoarthritis of the knees, asthma, and obesity. Filing 9-2 at 19. The ALJ concluded that these impairments imposed more than minimal limitations on the plaintiff's capacity to perform basic work. *Id.* The ALJ also found the following non-severe impairments that have no more than a minimal effect on the plaintiff's capacity to work: hypertension, thalassemia, and anemia. *Id.*

At step three, the medical severity of the claimant's impairments is considered. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments meet or equal a presumptively disabling impairment listed in the regulations, the analysis ends, and the claimant is automatically found disabled and entitled to benefits. *Gonzales,* 465 F.3d at 894. The ALJ acknowledged that the plaintiff did not contend that any of her impairments met or medically equaled a listing. *Id.* But, the ALJ went ahead and evaluated the medical evidence in reference

to listings 1.02 (major disfunction of joints), 3.03 (asthma), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders). The ALJ found that the plaintiff's conditions did not meet or equal the criteria for the various listings for a variety of reasons.

At step four, a claimant has the burden to prove the lack of a residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *Gonzales,* 465 F.3d at 894. The ALJ found that the plaintiff was able to perform work that does not require crawling or climbing ladders, ropes or scaffolds, and that does not require more than occasional climbing of ramps and stairs, balancing, kneeling, stooping, or crouching. The plaintiff could also perform work that does not require concentrated exposure to pulmonary irritants, hot or cold temperature extremes, humidity, or workplace hazards such as unprotected heights and moving mechanical parts. Further, the plaintiff cannot perform complex tasks, but can do detailed tasks necessary for semi-skilled work. The plaintiff can have occasional contact with coworkers, and only occasional face-to-face contact with the public. Filing 9-2 at 21. The ALJ concluded, based on the plaintiff's residual functional capacity, she was capable of performing past relevant work as a customer service clerk, and therefore was not disabled. Filing 9-2 at 25-26.

The plaintiff timely notified the Appeals Counsel that she was requesting review of the ALJ's unfavorable decision. Filing 9-4 at 71-72. The Appeals Counsel denied the plaintiff's request for review. Filing 9-2 at 2-7. The ALJ's October 2, 2018, decision is now the final administrative order.

## II. STANDARD OF REVIEW

This Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a

whole." *Combs v. Berryhill,* 878 F.3d 642, 645-46 (8th Cir. 2017). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." *Id.* The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." *Id.* The Court will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue,* 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court defers to the ALJ's determinations regarding credibility so long as such determinations are supported by good reasons and substantial evidence. *Boettcher v. Astrue,* 652 F.3d 860, 863 (8th Cir. 2011).

### III. DISCUSSION

1. SUBSTANTIAL EVIDENCE DOES NOT FULLY SUPPORT THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY DETERMINATION.

The ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but the plaintiff's claims concerning intensity, persistence and the limiting effects of her symptoms were not entirely consistent with the medical and other evidence in the record. Filing 10-2 at 20. Consistent with *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1998), when assessing a plaintiff's credibility regarding subjective complaints, an ALJ must consider the plaintiff's prior work history; daily activities; duration, frequency and intensity of symptoms; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Tate v. Apfel,* 167 F.3d 1191, 1196 (8th Cir. 1999). Using the *Polaski* factors, a plaintiff's subjective complaints may be

discounted if there are inconsistencies in the evidence as a whole. *Bryant v. Colvin,* 861 F.3d 779, 782 (8th Cir. 2017).

The plaintiff's appeal focuses on two facets of the ALJ's findings and conclusions regarding the plaintiff's residual functional capacity; (1) the plaintiff's capacity to perform semi-skilled labor, and (2) the adequacy of the limitation regarding only occasional face-to-face contact with the public.

### (a) Plaintiff's Capacity for Semi-Skilled Labor

The plaintiff argues that the ALJ's determination that she has the capacity to perform semi-skilled labor is not supported by substantial evidence. There were three medical opinions in the record that provided significant insight regarding the plaintiff's mental capacity for competitive employment. Those opinions do not rate the plaintiff's capacity above the simple, unskilled level. The state agency psychologist who first reviewed the plaintiff's file opined that the plaintiff was capable of simple, unskilled work as listed in the mental residual functional capacity assessment. Filing 9-3 at 8. The mental residual functional capacity assessment identified several concerns regarding the plaintiff's functioning. Filing 9-3 at 11-13.

Specifically, the plaintiff was found to have understanding and memory limitations, such that the plaintiff may have difficulty remembering detailed instructions due to anxiety and being easily overwhelmed. Filing 9-3 at 11-12. Limitations were identified regarding the plaintiff's capacity for sustained concentration and persistence, her ability to complete a normal workday and workweek without interruption, and her ability to perform at a consistent pace without an unreasonable number and length of rest periods. Filing 9-3 at 12. These limitations were deemed to be the result of the plaintiff's inability to deal with stress and anxiety. Further, the plaintiff's social interactions were found to be limited, as well as her capacity to respond to workplace changes.

Filing 9-3 at 12-13. A different state agency psychologist reviewed the findings and conclusions in the initial assessment, including the findings in the mental residual functional capacity assessment, and reported confirming all findings and conclusions. Filing 9-3 at 22, 27-29.

The state agency's consulting psychologist, Dr. Jennifer Lindner, did not opine directly on the plaintiff's capacity to perform semi-skilled work. However, in completing a form provided by the state agency, Dr. Lindner indicted that the plaintiff would be able to understand and remember short and simple instructions, and carry out such instructions under ordinary supervision. Filing 9-7 at 43. It is unknown whether Dr. Lindner's response reflected her view regarding the limits of the plaintiff's functional capacity. But Dr. Lindner did make findings similar to the findings reported by the state agency psychologists in assessing the plaintiff's mental residual functional capacity. Dr. Lindner found that the plaintiff had significant symptoms of panic disorder and depression that negatively impacted her functioning. Filing 9-7 at 42. Dr. Lindner also found impairment in social interactions, that the plaintiff tended to withdraw and avoid interactions with people, and would struggle interacting with co-workers and supervisors. Filing 9-7 at 41.

In concluding that the plaintiff had the mental residual functional capacity to perform semi-skilled work, the ALJ gave only some weight to the opinions of the state agency psychologists and Dr. Lindner. Filing 9-2 at 25. The ALJ did not cite a medical opinion expressly supporting his conclusion that the plaintiff had the capacity to perform semi-skilled work. Instead, the ALJ believed that the evidence in the record did not support the psychologists' opinions that the plaintiff was limited to simple, unskilled work. Filing 9-2 at 24.

A plaintiff's residual functional capacity is determined based on all relevant evidence; including the medical records, observations of treating physicians and others, and the plaintiff's own descriptions of her limitations. *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). But, a plaintiff's residual functional capacity is a medical question, and requires medical evidence indicating such plaintiff's capacity to function in the workplace. *Brown v. Barnhart,* 390 F.3d 535, 539 (8th Cir. 2004). An ALJ may not simply draw his own inferences about a plaintiff's functional capacity or limitations from the medical reports. *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017).

The evidence the ALJ cited for his belief that the opinions of the psychologists were only entitled to some weight, which was also the evidence the ALJ relied on to support his opinion that the plaintiff's functional capacity was greater than what the psychologists opined, was essentially two-fold. Filing 9-2 at 24-25. First, the ALJ asserted that the "mental status examinations" in evidence note "few mental abnormalities." Filing 9-2 at 24. The ALJ did not specifically cite to the record and precisely identify the mental status examinations that he believed supported that conclusion.

There are mental status exam reports in the evidence. Those reports are incorporated into the several therapy and progress reports authored by Beadell and Smith. Those mental status exam reports are not narratives, but are preprinted forms with boxes to check regarding the plaintiff's general appearance, behavior and attitude. Beadell and Smith consistently checked both the depressed and anxious boxes on the forms, which are the specific "mental abnormalities" that are germane to the plaintiff's claim. *See* filing 9-8 at 6, 18; filing 9-9 at 6; filing 9-10 at 22. Thus, if the ALJ was referring to mental status exam reports, specifically designated as such and prepared by the plaintiff's treating mental health providers, his conclusion that few

"mental abnormalities" are noted is off-base. All of the plaintiff's evaluators consistently reported observing and diagnosing anxiety and depression—the specific "mental abnormalities" that are the source of the plaintiff's work-related limitations.

To the extent that the ALJ was referencing portions of various progress notes in general—that is, sections of progress notes that are not specifically identified as mental status exams—it is possible that the ALJ could be referring to four reports, which, in a prior section of his decision, he characterized as "numerous examinations noting that the claimant has a normal mood and affect, which suggests that the claimant's anxiety is not as limiting as she alleged in her testimony." Filing 9-2 at 22.

However, of the four reports cited by the ALJ, three were from Dr. Schalley, who was not specifically treating the plaintiff's mental health issues. Dr. Schalley's reference to the plaintiff's mood and affect being normal is found in the physical exam boilerplate of her progress notes—and not part of a mental status examination. *See*, e.g. filing 9-7 at 29. Also, the ALJ failed to note that in each of Dr. Schalley's progress notes, she included a diagnosis of either major depressive disorder, mood disorder, insomnia, or anxiety, which are the mental health concerns relevant to the plaintiff's disability claim. Further, at the plaintiff's appointments, Dr. Schalley identified and adjusted the prescription medications the plaintiff was taking for treatment of her anxiety and depression. Filing 9-7 at 8, 29; filing 9-10 at 51. In summary, Dr. Schalley's progress notes clearly demonstrate her view that the plaintiff's anxiety and depression symptoms were significant.

The ALJ's fourth reference concerned Beadell's progress note of October 16, 2016. Beadell reported that the plaintiff was having some success with coping skills, and that she "appeared to be in a good mood and didn't get as

teared up like she normally does in session." Filing 9-10 at 2. Similar to Dr. Schalley, Beadell's diagnosis of the plaintiff was generalized anxiety disorder and major depressive disorder.

Passing reference to the plaintiff's presentation when she was participating in supportive therapy with trusted mental health professionals, or when she presented for an examination with a trusted primary care physician, cannot act as a measure of the plaintiff's mental capacity for performing competitive work. Appearing to be in a good or normal mood for the purposes of a treatment program has little or no necessary relation to a plaintiff's ability to work, or to work-related functions. *Hutsell v. Massanari,* 259 F.3d 707, 712 (8th Cir. 2001). A plaintiff's medical condition and the nature of life activities should be considered against the backdrop of the capacity to perform in the competitive labor market. *See Nowling v. Colvin,* 813 F.3d 1110, 1122 (8th Cir. 2016).

The state agency psychologists opined on the plaintiff's capacity to perform in the competitive labor market, and Dr. Lindner identified factors that would negatively affect the plaintiff's capacity to successfully hold employment. The plaintiff's presentation at her supportive mental health treatment appointments does not negatively implicate those opinions.

The second factor the ALJ referenced in connection with the weight given to the psychologists' opinions was that the plaintiff had performed semi-skilled work in the years leading up to her alleged disability onset date. Filing 9-2 at 24-25. Further, the ALJ found that the plaintiff's employment with Conagra "appears to have ended not necessary (sic) because of her anxiety." Filing 9-2 at 25. The ALJ's finding is not supported by the record. According to the ALJ, the plaintiff lost her job with Conagra because she appropriately handled a specific incident with an abusive customer. *Id.* The ALJ did not further explain

how or why properly doing her job resulted in termination of the plaintiff's employment.

Good reasoning and the evidence in the record as a whole does not support the ALJ's conclusion that the plaintiff lost her job with Conagra because she appropriately handled a specific incident. Virtually the first question the ALJ asked the plaintiff at the hearing turned out to be the conclusion the ALJ included in his decision. The ALJ asked, "it looks like that job ended because you had a bad interaction with a customer, you hung up on him or something like that." *Filing 9-2 at 39*. The plaintiff, however, did not accept the ALJ's suggestion, but corrected him and said that she had hung up on several customers. *Id.* She said it was a bad day and she had back-to-back bad calls, which were overwhelming, and she just could not handle it. *Filing 9-2 at 40*. She said that there were days when she could only work a half day because she was overwhelmed. *Id.* Although the plaintiff said she thought she followed protocol when she hung up on the abusive customer, she admitted that her employer did not think she handled the call appropriately, and if anybody else had done what she did, they too would have gotten in trouble. *Filing 9-2 at 40-41*. She said that Conagra provided all kinds of training to help her handle abusive callers, but she would get overwhelmed and emotional. *Filing 9-2 at 41-42*.

Further, the plaintiff testified that she would also get overwhelmed by Conagra callers with emotional stories. *Filing 9-2 at 42*. She said she lost her Alpine Access job—the job she had immediately before Conagra—because most of the calls were from angry eBay or Home Depot account holders and she could not handle dealing with the conflicts. She missed work at Alpine at least once a week because of her anxiety. *Filing 9-2 at 43*. Finally, the plaintiff testified

about her failed customer service job interview where she was overwhelmed during a role-play customer confrontation. Filing 9-2 at 44-45.

The Court finds that the ALJ's residual functional capacity finding that the plaintiff could perform semi-skilled work is not supported by good reasons or substantial evidence in the record as a whole. There is no medical opinion concluding that the plaintiff has the capacity to perform semi-skilled work. And the opinions of the psychologists that are part of the record either expressly find that the plaintiff is limited to simple, unskilled work, or report limitations that relegate the plaintiff to simple, unskilled work.

### (b) Limitation of Occasional Face-to-Face Contact

The plaintiff complains that the ALJ's limitation of only occasional face-to-face contact with the public "reflects a results-oriented determination process." Filing 13 at 14. The Court does not agree with plaintiff's counsel's inference regarding the ALJ's decision-making process. Notwithstanding, the Court will consider the plaintiff's complaint as an objection, arguing that substantial evidence does not support the conclusion that the plaintiff is limited to only occasional face-to-face contact with the public.

When posing his hypothetical, the ALJ asked the vocational expert to accept the following; "Mentally, let's start with no more than occasional contact with coworkers, and no more than occasional face-to-face contact with the public." Filing 9-2 at 64. When asked if the plaintiff's past relevant work would remain, the vocational expert replied, "It sounds like the past relevant work as actually performed would remain because you said occasional face-to-face public contact . . . but I'm assuming that that means telephone contact would be acceptable." Filing 9-2 at 65. The ALJ's response was, "Yeah, that's what I'm thinking for this hypo, yes." *Id.* Inquiring further, the ALJ changed the hypothetical and replaced only occasional face-to-face contact with the public,

with "no more than occasional contact with the public as part of their job duties." *Id.* Before the vocational expert could respond, the ALJ said, "I assume that would then preclude that work," meaning the plaintiff's past relevant work. The vocational expert agreed. *Id.*

In his decision, the ALJ did not explain why a limitation for only occasional face-to-face contact with the public was required, but a limitation regarding telephone or other contact with the public was unnecessary. The plaintiff's past relevant work included only telephone contact with the public, not face-to-face contact. But as previously detailed, this Court found that the ALJ's conclusion in this regard is not supported by good reasons or substantial evidence in the record as a whole.

There is nothing in the evidence as a whole that would suggest the plaintiff's anxiety and panic attacks only occurred during face-to-face contacts with the public. Indeed, there is no evidence to suggest that face-to-face confrontations, as opposed to confrontations during telephone calls, would have a greater impact, or for that matter, even a different impact on the plaintiff's susceptibility to overwhelming anxiety and panic attacks. The plaintiff's past relevant work only included telephone-based customer service. The evidence in this matter is undisputed that, at all times, the plaintiff was overwhelmed by telephone call confrontations with customers during the course of two jobs over a four-year period.

A vocational expert's testimony constitutes substantial evidence, but only when it is based on a hypothetical that incorporates all of a plaintiff's proven impairments. *Hulsey v. Astrue,* 622 F.3d 917, 922 (8th Cir. 2010). Hypothetical questions must include all impairments supported by substantial evidence and accepted as true, and capture the concrete consequences of those impairments. *Jones v. Astrue,* 619 F.3d 963, 972 (8th Cir. 2010). Hypothetical

questions that do not encompass all of the concrete consequences of relevant impairments cannot constitute substantial evidence to support an ALJ's decision. *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).

The Court finds that a concrete consequence of the plaintiff's anxiety and depression is social isolation and feeling panicked and overwhelmed when confronted, whether or not the confrontation is face-to-face or over the telephone. Accordingly, substantial evidence in this record does not support the ALJ's findings regarding the plaintiff residual functional capacity, or the vocational expert's opinion predicated on the ALJ's residual functional capacity finding, or the ALJ's conclusion that the plaintiff's past relevant work is not precluded.

### 2. APPOINTMENTS CLAUSE.

The plaintiff raised for the first time on appeal a claim that the ALJ was an inferior officer who, pursuant to *Lucia v. SEC*, 138 S. Ct. 2044 (2018), required appointment by the President, Courts of Law, or the Commissioner.[3] Consistent with *Lucia,* the plaintiff asks that this matter be remanded and that a different ALJ be assigned to determine her claim for benefits.[4] Filing 13

---

[3] The Appointments Clause provides, in pertinent part, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II § 2, cl. 2.

[4] In *Lucia,* the matter was remanded for a new hearing before a different factfinder. "To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled." *Lucia,* 138 S. Ct. at 2055.

at 21-27. In response, the Commissioner posits that if remand is warranted, this issue may be treated as essentially moot. Filing 17 at 4.

The Court agrees with the Commissioner. The plaintiff's Appointments Clause objection may be raised on remand. It will be up to the Commissioner whether to have the previous ALJ preside, or whether it would be prudent to assign a different ALJ and avoid any later challenge that may arise pursuant to *Lucia*.

III. CONCLUSION

The ALJ's denial of benefits is not supported by substantial evidence on the record as a whole. This matter is remanded for further proceedings consistent with this Memorandum and Order.

IT IS ORDERED:

1.  Archibald's motion for reversal of the Commissioner's final decision (filing 12) is granted.

2.  The Commissioner's motion to affirm the Commissioner's final decision (filing 15) is denied.

3.  The Commissioner's decision is reversed.

4.  This matter is remanded back to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Court's Memorandum and Order.

5.  A separate judgment will be entered.

Dated this 25th day of February, 2020.

BY THE COURT:

John M. Gerrard
Chief United States District Judge